**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

-------------------------------------------------------------X

| | | |
|---|---|---|
| DANA INCORPORATED, | : | No. 3:21-cv-00758-JZ |
| | : | |
| Plaintiff, | : | Judge Jack Zouhary |
| | : | |
| -against- | : | **Amended Complaint** |
| | : | |
| ZURICH AMERICAN INSURANCE COMPANY, | : | **Jury Trial Demanded** |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------X

## I.     INTRODUCTION

1.      This action arises out of Zurich American Insurance Company's improper refusal to provide coverage promised under an insurance policy it issued to Dana Incorporated.

## II.     PARTIES

2.      Among other things, Dana is a world leader in providing power-conveyance and energy-management solutions for vehicles and machinery. Dana is a Delaware corporation having its principal place of business in Maumee, Lucas County, Ohio.

3.      Zurich American Insurance Company is an insurance company.

## III.     JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over Zurich because it regularly transacts business in Ohio.

5.      This lawsuit arises out of an insurance policy that Zurich issued to Dana in Ohio to insure property located in Ohio, among other places.

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interests, costs, and attorney's fees.

1

7.      Venue is proper in this District under 28 U.S.C. § 1391 because this District is where a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated.

## IV.      BACKGROUND

### A.      Dana's Operations

8.      Dana operates in dozens of countries and has more than 150 major facilities around the world. It employs more than 35,000 people.

9.      Dana's portfolio improves the efficiency, performance, and sustainability of light vehicles, commercial vehicles, and off-highway equipment.

10.      From axles, driveshafts, and transmissions to electrodynamic, thermal, sealing and digital solutions, the company enables the propulsion of conventional, hybrid, and electric-powered vehicles by supplying nearly every major vehicle and engine manufacturer in the world.

### B.      Dana's Claim

11.      COVID-19 is a deadly communicable disease that, as of May 21, 2021, has infected more than 32 million people and caused more than 584,900 deaths in the U.S. alone. Centers for Disease Control and Prevention (CDC), *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (providing a running total of COVID-19 cases and deaths).

12.      On March 11, 2020, the World Health Organization determined that the coronavirus, which causes COVID-19, constituted a global pandemic.[1]

---

[1] COVID-19 is the disease caused by SARS-CoV-2; COVID-19 is not a virus. World Health Organization, *Naming the coronavirus disease (COVID-19) and the virus that causes it*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (announcing the names for the 2019 coronavirus and the disease it causes). The virus and the disease are often referenced interchangeably as "COVID-19." Dana adopts the practice here for ease of reference.

13.     A pandemic, by definition, is "an epidemic occurring worldwide . . . ." Heath Kelly, *The classical definition of a pandemic is not elusive*, 89 Bulletin of the WHO 7, at 540-41 (2011) (https://www.who.int/bulletin/volumes/89/7/11-088815/en/) (last visited May 21, 2021).

14.     As a declared pandemic, COVID-19 is present globally.

15.     COVID-19 is a physical substance that can spread through the respiratory droplets of infected individuals.

16.     Although COVID-19 is "novel," scientists now understand that the virus spreads through three primary modes of transmission.

17.     First, COVID-19 spreads via airborne transmission when an uninfected person inhales droplets of the saliva or nasal discharge released when an infected person speaks, sneezes or coughs. CDC, *How COVID-19 Spreads* (last updated May 13, 2021) (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html) (last accessed May 21, 2021); CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne*.

18.     Second, smaller droplets, known as aerosols, can linger in the air for hours infecting people over a greater distance and even after the infected person has left the premises. Aerosol droplets may even be pulled into air circulation systems and spread to other areas in a building. This kind of spread is referred to as aerosol or airborne transmission.

19.     Aerosol transmission involves the airborne transmission of viral RNA in particles smaller than 50 microns (human hair is about 80 microns), and which do not settle onto surfaces like larger droplets emitted through saliva and nasal discharge. Aerosol transmission typically involves viral RNA emitted through exhaled breath like larger droplets emitted through saliva and nasal discharge.

20.     Third, Respiratory droplets carrying COVID-19 can also land on surfaces and objects, where they can remain viable for hours or days, rendering the surface or object unsafe and dangerous for continued use, because they may infect another person who comes into contact with one of these surfaces or objects.

21.     In other words, COVID-19 can attach to and cause lasting damage to property, including air.

22.     The CDC has recommended preventative and control practices in manufacturing facilities to prevent the spread of COVID-19 as much as possible. CDC, *Interim guidance from CDC and the Occupational Safety and Health Administration (OSHA)* (updated Apr. 16, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-manufacturing-workers-employers.html.

23.     Due to the risks associated with COVID-19, physical alteration of property is necessary to render the property safe from COVID-19 and to return the property to a safe and useable state. For instance, according to the CDC, manufacturers should use engineering controls like physical barriers, such as strip curtains, plexiglass or similar materials, or other impermeable dividers or partitions to separate manufacturing workers from each other.

24.     Dana has adopted and implemented these and other preventative and remedial measures in order to combat COVID-19 and the related physical loss and damage, incurring significant extra expense.

25.     These measures include installing temperature sensors, reconfiguring work stations and creating physical barriers, among others.

26.     Despite its efforts, Dana continues to incur extra expense combating COVID-19 and the related physical loss and damage.

4

27.     Given the nature of Dana's operations, among other reasons, the presence of COVID-19 on real and personal property at Dana locations causes a tangible alteration to that property. It can change the property, including air and the surfaces, rendering the affected property unsafe, unfit and uninhabitable for ordinary functional use.

28.     Experts have determined that COVID-19 is a communicable disease that impacts and physically damages property because persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces. This results in tangible physical transformation of the air and surfaces, rendering them dangerous transmission vehicles for the potentially deadly disease. The impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property. Routine cleaning and disinfection alone are insufficient to remediate the loss or damage, and there is no known way in which to clean air to eliminate the risk of airborne transmission.

29.     Epidemiologists have determined that individuals with COVID-19 alter the physical characteristics of surfaces and the air of occupied spaces where those individuals are present with respiratory secretions and aerosols. As a result, altered surfaces and air become vehicles for COVID-19 transmission.

30.     Under normal operating conditions, there is no effective way to fully repair or remediate the physical loss or damage caused by COVID-19 to properties like Dana's, because COVID-19 is constantly reintroduced to the property.

31.     Short of complete and extended closure, which would only increase Dana's covered losses, implementation of strict administrative and operational controls that, among other things, limit the number of persons at a location, are the only effective ways to attempt to repair or remediate the physical loss or damage caused by COVID-19 and protect against further loss or

damage from COVID-19. Mere cleaning and disinfecting of the property and the indoor air (even if it were possible) does not repair or remediate the actual physical and tangible alteration to property caused by COVID-19.

32.     This is particularly the case with property where attempts to remove COVID-19 from the property does not fully repair or remediate the physical damage and tangible alteration to property due to the continuous reintroduction of COVID-19 to the property by employees and others.

33.     Beginning in or around March 2020, COVID-19 caused a distinct, demonstrable, physical change and/or tangible alteration to Dana locations and property that Dana depends upon to conduct its normal business operations.

34.     However, given the absence of commercially-available tests for surface and aerosol presence of COVID-19 and the shortage of testing kits for humans, positive test results are not and cannot be the only means of proving the presence of COVID-19.

35.     In addition, numerous Dana employees exhibited signs or actual symptoms of COVID-19, tested positive for COVID-19, or were exposed to COVID-19, since March 2020 and were or had been present in Dana locations.

36.     In addition to having actual presence of COVID-19 at Dana locations due the actual presence of persons infected with COVID-19, Dana sustained a distinct, demonstrable, physical change and/or tangible alteration to its property based on the statistically certain presence of COVID-19.

37.     Statistical modeling confirms beyond any reasonable doubt and to a high degree of statistical certainty that COVID-19 was and continues to be present at Dana locations.[2]

---

[2] *See also, COVID-19 Event Risk Assessment Planning Tool*, Georgia Institute of Technology (https://covid19risk.biosci.gatech.edu/) (last visited May 21, 2021).

38.     Positivity rates, which are material to statistical modeling, measure saturation of COVID-19 in a particular locale. Among other things, positivity rates are used to determine the statistical likelihood that at least one COVID-19 positive person will enter a facility.  Positivity rates are an indicator of the ubiquitous presence of COVID-19.[3]

39.     The WHO recommends that a particular area reach a positivity rate of 5.00% or lower before reopening.[4]

40.     As of this filing, Johns Hopkins University calculates 16 states to have a positivity rate that is above 5.00%.[5]

41.     Government authorities have also recognized the effect of COVID-19 and have issued orders that affect Dana's operations (the "Orders").

42.     The Orders caused Dana to completely suspend or slowdown its operations.

43.     For instance, at Dana's facility in Pottstown, Pennsylvania, most operations were suspended due to government order.

44.     The distinct, demonstrable, physical change, and tangible alteration to property that directly caused the issuance of the Orders includes, among other things, the ability of COVID-19 to attach to surfaces for prolonged periods, remain viable in indoor air, and render property unsafe for normal use, and the loss of functionality and reliability of property caused by COVID-19 when it transforms air and property into a dangerous and potentially deadly instrumentality.

---

[3] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns Hopkins Bloomberg School of Public Health (Aug. 10, 2020) (https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html) (last visited May 21, 2021).
[4] *See* Johns Hopkins University & Medicine, *WHICH U.S. STATES MEET WHO RECOMMENDED TESTING CRITERIA?*, (https://coronavirus.jhu.edu/testing/testing-positivity) (last visited May 21, 2021).
[5] *Id.*

45. Because COVID-19 regulations and the Orders remain in effect, Dana continues to experience losses. Dana experienced direct physical loss or damage to property due to COVID-19 and the Orders.

46. The Orders have also affected Dana's customers and suppliers.

47. In addition, Dana's customers and suppliers have taken actions to protect against the presence of COVID.

48. Dana's industry—automobile manufacturing—is a "just in time" business, meaning that as a general matter, participants in the supply chain hold very low inventories. Thus, as soon as one participant in that supply chain shuts down, whether a customer or a supplier, the effect is quickly felt throughout the supply chain.

49. Despite its efforts, Dana has not resumed its full operations and continues to incur extra expense combating COVID-19 and the related physical loss and damage.

50. Dana reported its losses to Zurich on April 14, 2020 and has had subsequent communications with Zurich.

**C.     The Policy**

51. Zurich issued policy number PPR 5917981-14 to Dana for the period of January 1, 2020 to January 1, 2021. Zurich has a copy of the insurance policy, which is voluminous and not attached to this Complaint. The policy lists Dana Incorporated as the "Named Insured."

52. The policy provides up to $750,000,000 in coverage per occurrence, subject to certain sublimits.

53. The policy contains the following insuring agreements:

> Insurance provided under this policy applies to loss or damage caused by or resulting from risks of direct physical loss of or damage from any external cause to covered

8

> property occurring at a premises described within the Territory of the policy, unless excluded.
>
> . . .
>
> This Policy covers property, as described in this Policy against ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

54.     The policy contains the following with respect to Time Element losses:

> This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured  . . . to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below . . .

55.     The policy contains several coverages, which provide additional protection to Dana. The coverages include Extended Period of Liability, Extra Expense, Rental Insurance, Civil or Military Authority, Contingent Time Element Extended, Ingress/Egress, Logistics Extra Cost, and Protection and Preservation of Property, among others.

56.     The policy does not exclude losses related to COVID-19, communicable disease, or pandemics.

57.     Some insurance companies do include exclusions for losses arising out of any virus.

58.     Zurich drafted the policy, but decided not to include such an exclusion in the policy.

59.     In exchange for Zurich's agreement to insure Dana, Dana paid Zurich a premium of $3,214,869.94.

**D.     The Insurance Industry and Zurich Knew of the Risks and Dangers of the Pandemic and the Potential for Coverage**

60.     Insurers, like Zurich, are in the business of risk. Insurers have a wide range of

actuarial risk measures available to them to determine the potential and magnitude of

catastrophic risks. They also have several tools at their disposal to manage exposure to any given

risk, including premium adjustments and reinsurance. Pandemics are among the risks insurers

have and can plan for and adjust their operations accordingly.

61.     The industry has been aware for years of the potential impact of pandemics. It has

been a frequent subject of industry articles, speeches, and conferences. For example:

a.   In 2015, the Center for Insurance Policy and Research held an event titled

"The Risk of Pandemics to the Insurance Industry" to explore the risk of

pandemics to the health, life and property and casualty industries. Among

the "key takeaways" was the potential for "business continuity/business

interruption/extra expense loss," meaning "Insurance companies must

properly implement appropriate planning and response protocols before

and during the event." The Risk of Pandemics to the Insurance Industry:

Lessons Learned from the 2015 CIPR Symposium Applicable to COVID-

19 (Apr. 15, 2020).

b.   One article from March 2018 noted: "Even with today's technology, a

modern severe pandemic would cause substantive direct financial losses to

the insurance community. In addition, indirect losses would be severe,

most notably on the asset side of the balance sheet."[6]

c.   The Insurance Library Association of Boston (founded in 1887) lists on its

website at least 15 articles, reports, and white papers available to insurers

---

[6] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018) (https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic- Can-Teach-Today-s-Insurers/) (last visited May 21, 2021).

from early 2007 through 2018.[7]  The Association states on its website:
"The past 20 years has seen the rise of a number of pandemics. Slate
recently published an article on what has been learned about treating them
in that time. We thought it might be apt for us to take a look back and see
what the insurance industry has learned as well." The webpage then lists
various articles and reports discussing the risks and impacts of pandemics
on the insurance industry. For example, an article from 2014 stated that
pandemics "can have a significant impact on life and health insurance
portfolios, and, depending on contract terms, could also affect other lines
such as workers' compensation, **business interruption**, travel and event
cancellation and disability insurance."[8] Nita Madhav, "Travel Sickness:
Pandemic Risk Models Show Diseases Move More Quickly and with
Greater Impact in our Connected World," *Best's Review*, 115 no. 8
(Dec. 1, 2014) (emphasis added).

62.     Moreover, over the course of decades, courts have held that the presence of a
hazardous substance at or on a property, including the airspace inside buildings, constitutes
property damage. Many courts have also held that the closure of property due to imminent risk of
physical loss or damage or danger to inhabitants constitutes physical loss of property. Upon
information and belief, insurers, including Zurich, have been and continue to be aware of these
court decisions.

---

[7] *See* https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited May 21, 2021).
[8] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater
Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014) (emphasis added).

63. After the SARS outbreak in 2002-2003, in which insurers paid business interruption losses, the insurance industry undertook to draft an exclusion for virus-related losses.

64. A circular that accompanied the exclusion explained to state insurance regulators the potential for viruses to cause direct physical losses and damage leading to business interruption claims:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. *When disease-causing viral or bacterial contamination occurs, potential claims involve* the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and *business interruption (time element) losses*.

(Emphasis added.)

65. At all relevant times, Zurich has been aware of this exclusion for virus-related losses but decided to not include any such exclusion in the policy issued to Dana.

## V. INSURANCE COVERAGE

### A. The Policy's "All Risks" Coverage Is Triggered

66. Since 2020, COVID-19 has been present in or around Dana's locations.

67. Additionally, Dana employees have tested positive for COVID-19.

68. As described above, COVID-19 can attach to surfaces and remain in the air causing physical loss or damage to property.

69. Individuals, including employees, infected with COVID-19 have been at Dana locations frequently, regularly, and consistently over the course of this pandemic.

70. While on-site, individuals infected with COVID-19 shed SARS-CoV-2 (the causative agent of the COVID-19) into the indoor air and onto surfaces throughout the property.

71.     As a result of this shedding, infectious SARS-CoV-2 particles remained suspended in the indoor air and present on surfaces (both of which are covered property under the policy) at Dana locations.

72.     Due to the high-volume of individuals, including employees, at Dana locations and the high prevalence of infection among the population, COVID-19 and SARS-CoV-2 has been present at Dana's properties.

73.     The presence of COVID-19 in the air and on surfaces causes physical loss and damage to the property by causing a physical alteration of the air and surfaces from a safe and functional condition to an unsafe and non-functional condition, preventing normal operations consistent with Dana's practices before the pandemic.

74.     The actual presence of COVID-19 at Dana's locations constitutes direct physical loss or damage.

75.     The "all risks" coverage is triggered.

76.     COVID-19 is not excluded under the policy.

77.     In addition to the policy's "all risks" coverage, COVID-19 and the Orders trigger other coverages under the policy, including, but not limited to, the coverages addressed below.

**B.     Time Element Coverages**

78.     Zurich agreed to insure the Time Element loss.

79.     Dana incurred and continues to incur Time Element loss directly resulting from physical loss or damage of the type insured.

**C.     Extra Expense**

80.     The policy insures "the reasonable and necessary extra costs incurred" during the PERIOD OF LIABILITY.

81.     These expenses include the "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business."

82.     Dana incurred and continues to incur extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business. For example, Dana has incurred expenses for personal protective equipment that is more than the amount it would incur during normal operations.

83.     The expenses are over and above the expenses that Dana would have normally incurred had there been no direct physical loss of or damage caused by COVID-19.

**D.      Civil or Military Authority**

84.     The policy insures the "Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts, or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometers of it."

85.     Starting in 2020, numerous orders of civil authority, including the Orders, have limited, restricted, or prohibited partial or total access to insured locations and have been issued as a direct result of physical damage of the type insured at insured locations or within five statute miles/eight kilometers of them.

86.     Dana has experienced loss from those orders.

**E.      Contingent Time Element**

87.      The policy insures "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at contingent time element locations located within the TERRITORY of this Policy."

14

88.     The policy defines contingent time element location as

A. any location:

1) of a direct (Tier 1) or indirect (Tier 2) customer, supplier, contract manufacturer or contract service provider to the Insured;

2) of any company under a royalty, licensing fee or commission agreement with the Insured;

B. any location of a company that is a direct (Tier 1) or indirect (Tier 2) customer, supplier, contract manufacturer or contract service provider to a location described in A above, not including locations of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

89.     Dana has incurred Contingent Time Element loss covered by the policy.

90.     Dana's customers and suppliers have experienced physical loss or damage of the type insured to property at their locations.

91.     For example, numerous customers and suppliers shut down due to physical loss or damage and COVID in their facilities.

**F.      Ingress/Egress**

92.     The policy insures "This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured or within five miles/eight kilometers of it."

93.     Dana has incurred Actual Loss Sustained and EXTRA EXPENSE due to partial or total physical prevention of ingress to or egress from insured locations and that prevention was a

direct result of physical damage of the type insured to property of the type insured or within five miles/eight kilometers of it.

### G.     Protection and Preservation of Property

94.     The policy insures the "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

95.     This provision is triggered because Dana incurred substantial losses for actions taken to protect or preserve insured property and those actions were necessary due to actual or to prevent immediately impending, insured physical loss or damage to that property.

### H.     No Exclusion Applies

96.     The "all risks" coverage applies unless there is a specific exclusion.

97.     No exclusion applies to preclude coverage for Dana's losses.

98.     Nonetheless, Zurich refused to provide Dana coverage for the claim, citing certain exclusions.

99.     In its denial, Zurich cited the Contamination exclusion, which, for the property damage section, excludes "contamination, and any cost due to contamination."

100.     The "Contamination" exclusion does not apply for multiple reasons, including the following. The amounts for which Dana seeks coverage are covered under the Time Element section of the policy, and the contamination exclusion does not apply to that section of the policy. In addition, even if it applied to that section of the policy, the exclusion provides that the policy does not cover "contamination, and any cost due to contamination." Dana is not asking Zurich to cover "contamination." Dana asks Zurich to cover for losses and expenses. The limited scope of the contamination exclusion is apparent when compared to other exclusions in the

16

policy that exclude "loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss."

101.    In its denial, Zurich cited another exclusion called the Micro-organism Exclusion (MAP), which, for the property damage section, excludes "loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to: mold, mildew, fungus, spores or other microorganism of any type, nature or description, including but not limited to any substance whose presence poses an actual or potential threat to human health."

102.    The MAP exclusion does not apply for multiple reasons, including the following. The term "microorganism" must be construed in the context of the preceding terms and, therefore, does not include things like a virus. If "microorganism" includes "virus," then including virus in the definition of contamination becomes superfluous since any losses arising out of viruses would have already been excluded in the microorganism exclusion under Zurich's view. In any event, a virus is not a "microorganism" as that term is defined and understood.

103.    In its denial, Zurich cited another exclusion that applies to "loss from enforcement of any law or ordinance: a) regulating the construction, repair, replacement, use or removal, including debris removal, of any property . . . ."

104.    That exclusion does not apply for multiple reasons, including the following. It does not apply to the time element section. And it does not apply because the orders affecting Dana's operations do not regulate "the construction, repair, replacement, use or removal, including debris removal, of any property," the orders affecting Dana's operations are not laws or ordinances, and there was no enforcement against Dana of any law or ordinance.

105.    In its denial, Zurich cited exclusions for: "indirect or remote loss or damage," "interruption of business, except to the extent provided by this Policy," and "loss of market or loss of use."

106.    Those exclusions do not apply for multiple reasons, including the following. They do not apply to the time element section. And Dana's losses are not due to indirect or remote loss or damage, interruption of business (except to the extent provided by the policy), or loss of market or loss of use.

107.    Zurich's denial of Dana's claim was incorrect and without reasonable justification.

### VI.    COLLATERAL ESTOPPEL

108.    In other litigation, Zurich has relied on the arguments and defenses to coverage that Zurich has raised for Dana's claim. For instance, Zurich has asserted – and is expected to raise in this litigation – that Dana's claim does not satisfy the requirement in the policy for "direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property…." Zurich has raised the same argument and defense in connection with claims submitted by other policyholders.

109.    Courts have rejected the arguments that Zurich has asserted and is expected to raise in this litigation.

110.    For example, Henderson Road Restaurant Systems, Inc., doing business as Hyde Park Grille sought to recover amounts due under a policy issued by Zurich under a claim materially similar to Dana's claim. When Zurich did not acknowledge coverage, Henderson sued Zurich in the United States District Court for the Northern District of Ohio.

111.     Certain policy provisions at issue in the Henderson case are identical to or materially similar to the provisions in Dana's policy. For instance, the physical loss of or damage to requirement in the policy issued to Henderson and Dana's policy is the same.

112.     In their litigation, Henderson and Zurich filed competing motions for summary judgment. A copy of the summary judgment briefs are attached as Exhibit A, B, C, D, E, and F.

113.     The *Henderson* court granted Henderson's motion, in relevant part, and denied Zurich's motion in its entirety. A copy of the decision is attached as Exhibit G.

114.     Zurich had a full and fair opportunity to litigate the issues raised in the summary judgment motions filed in the *Henderson* lawsuit.

115.     In its ruling, the *Henderson* court rejected some of the arguments that Zurich has asserted and is expected to raise in this litigation on certain issues that are the same in both lawsuits. For instance, the *Henderson* court found that the requirement of physical loss of or damage to property was satisfied. That ruling is at odds with Zurich's position for Dana's claim.

116.     Based upon the *Henderson* court's decision, Zurich is collaterally estopped from raising the same or similar arguments that it raised in that litigation and that the court rejected.

## VII.     ZURICH ACTED IN BAD FAITH

117.     Zurich owes a duty of good faith to Dana.

118.     Zurich breached it duties by acting without reasonable justification, including by denying Dana's claim without reasonable justification and failing to make any efforts to perform its obligations.

119.     Zurich failed to conduct a reasonable investigation of Dana's claim.

120.     Instead, Zurich asked Dana to respond to extensive and burdensome requests for information even though Zurich had no intention of ever actually considering or properly adjusting Dana's claim.

19

121.    This is evidenced by Zurich's July 31, 2020 letter. For example, Zurich stated, "Zurich requests supporting information for any Civil/Governmental (or Equivalent) order requiring the closure of the locations. Zurich requests Dana provide a detailed description of the circumstances/facts for the alleged losses, including the cause of the losses."

122.    It is hard to see how Dana's response to Zurich's requests would affect Zurich's coverage position if it had already concluded that the presence of COVID-19 does not constitute direct physical loss of or damage to property and that exclusions barred coverage.

123.    Even after Zurich denied coverage based on its position that COVID-19 did not cause physical loss or damage and that the contamination and MAP exclusions barred coverage, Zurich still pressed Dana to provide yet more information. For example, in an October 2, 2020 letter, Zurich said "the presence or threatened presence of SARS-CoV-2 virus on property does not constitute or cause physical loss or damage. Even if the virus could constitute or cause physical loss or damage, it would be excluded by one or more applicable exclusions." In that same letter, Zurich demanded that "if Dana possesses [any] information or documentation" about "the virus's presence on any particular property," "please forward it to Zurich." Zurich never explained why, if its position was that the virus could never trigger coverage under the policy, it continued to hound Dana for additional information about the virus's presence at Dana's locations. There is no reasonable explanation for Zurich's actions.

124.    Zurich also made misrepresentations about the claim to Dana and failed to respond to Dana's inquiries about those misrepresentations. In its May 21, 2020 letter, Zurich stated that "the copy of the loss notice states as follows: 'ALLEGED COVID 19 LOSS.'" and that "the Property Loss Notice, also generated on April 16, 2020, describes the loss as follows: 'loss involving SARS-CoV-2 Business income Business income loss [sic].'" The April 14, 2020

20

notice provided to Zurich does not contain these statements. Given that, Dana asked Zurich to provide Dana with the documents to which it was referring. Zurich failed to provide those documents or even respond to Dana's request.

125.    In addition, on July 31, 2020, Zurich represented to Dana that Zurich would respond to Dana's July 23, 2020 letter shortly. Zurich did not respond until September 29, 2020.

126.    In sum, Zurich acted without reasonable justification and failed to exert an equal degree of attention and concern for Dana's interests as it would for its own.

127.    Zurich's bad faith caused and continues to cause Dana damages.

## COUNT I: BREACH OF CONTRACT

128.    Dana repeats and realleges the allegations in the preceding paragraphs.

129.    The policy is a valid, enforceable contract between Dana and Zurich.

130.    Dana has satisfied all of the policy's applicable terms, conditions, and requirements, including payment of premium.

131.    In the alternative, Zurich waived any right to insist upon compliance with the policy's terms, conditions, or requirements and any right to contest coverage.

132.    COVID-19, the COVID-19 pandemic, and the Orders trigger the policy's coverage.

133.    No exclusions apply.

134.    Thus, Dana is entitled to coverage for its losses and expenses arising out of COVID-19, the Orders, and the resulting physical loss of or damage to property.

135.    Zurich breached the contract by refusing to pay Dana for its losses and expenses in breach of the policy.

136.    Zurich's breach of the policy caused and continues to cause Dana damages.

137.    Dana is entitled to damages because of Zurich's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

### COUNT II: BREACH OF THE DUTY OF GOOD FAITH

138.    Dana repeats and realleges the allegations in the preceding paragraphs.

139.    Zurich owes a duty of good faith to Dana.

140.    Zurich breached that duty by acting without reasonable justification.

141.    Zurich's intentional, bad faith actions caused and continues to cause Dana damages.

142.    Dana is entitled to damages because of Zurich's breach of the duty of good faith and fair dealing in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

### PRAYER FOR RELIEF

Dana requests the Court enter judgment as follows:

(1)     Dana be awarded its damages resulting from Zurich's breach of the policy, including pre-judgment and post-judgment interest;

(2)     Dana be awarded damages resulting from Zurich's breach of good faith, including consequential, punitive and exemplary damages;

(3)     Dana be awarded its reasonable attorneys' fees and court costs;

(4)     Dana be awarded such other and further relief, general, special or consequential, at law or in equity, to which it may be justly entitled.

### DEMAND FOR JURY TRIAL

Dana demands trial by jury on all issues so triable.

22

May 21, 2021

Respectfully submitted,

_/s/ David Rodman Cooper_
David Rodman Cooper
Marshall & Melhorn, LLC
Four Seagate, Eighth Floor
Toledo, Ohio 43604
567-316-6260
rcooper@marshall-melhorn.com

Syed S. Ahmad*
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
202-955-1656
sahmad@huntonak.com

Patrick M. McDermott*
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219
804-788-8707
pmcdermott@hunton.com

* *Pro hac vice* motion to follow

*Attorneys for Dana Incorporated*